## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**TURN SERVICES, LLC**                                    **CIVIL ACTION**

**VERSUS**                                               **NO. 20-3012-WBV-JVM**

**GULF SOUTH MARINE**                                    **SECTION: D (1)**
**TRANSPORTATION, INC.**

## ORDER

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.      INTRODUCTION

This case arises from an allision that occurred on February 22, 2020 between several barges that were in Turn Services, LLC's ("Turn Services'") fleet and the M/V ASTORIA HARMONY.  Four of the barges and the M/V ASTORIA HARMONY sustained damages as a result of the incident.

On November 6, 2020, Turn Services filed a Complaint for Negligence, Breach of Contract, and Demand for Indemnity against Gulf South Marine Transportation, Inc. ("Gulf South"), asserting claims for negligence and breach of contract.[1]  Gulf South filed an Answer to the Complaint, denying those claims.[2]  The owner and the manager of the M/V ASTORIA HARMONY, Naviera Grace Victoria, Inc. and H&J Marine Inc., respectively (collectively, "Intervenors"), intervened in this action to

---

[1] R. Doc. 1.
[2] R. Doc. 5.

recover damages sustained by the M/V ASTORIA HARMONY during the allision.[3] Thereafter, Turn Services, Gulf South, and the Intervenors filed a Joint Stipulation into the regard, stating that the Intervenors claim $54,319.93 for damages associated with the February 22, 2020 barge breakaway that resulted in barges alluding with the moored M/V ASTORIA HARMONY.[4]   The parties further stipulated that the Intervenors will be entitled to a judgment in the amount of $54,319.93 against the party or parties found at fault in this litigation.[5]   In light of the Joint Stipulation, counsel for the Intervenors waived his appearance at trial, without objection from counsel for the remaining parties.[6]

This matter was tried before the Court without a jury on December 12 and 13, 2022.[7]   The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record in this matter.   Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law.   To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law may be construed as a finding of fact, the Court hereby adopts it as such.

---

[3] *See,* R. Docs. 10, 11, & 12.
[4] R. Doc. 35 at p. 1.   *See also*, Trial Exhibit 6 at p. 1.
[5] R. Doc. 35 at p. 2; Trial Exhibit 6 at p. 2.
[6] R. Doc. 60 at p. 1.
[7] R. Docs. 60 & 61.

## II.    FINDINGS OF FACT

1.  In February 2020, Gulf South owned and operated the M/V CAPT. ZIGGY and the M/V CORKY.[8]

2.  The M/V CAPT. ZIGGY is a 76-foot twin screw, uninspected, inland-service towing vessel with a four-man crew, while the M/V CORKY is a 65-foot twin screw, uninspected, inland service towing vessel with a four-man crew.[9]

3.  In February 2020, the M/V CAPT. ZIGGY was operating as a towing vessel under a Time Charter Agreement entered into between Turn Services and Gulf South.[10]

4.  The purpose of the Time Charter Agreement was "towing barges upon the instruction of the Charterer, Turn Services, LLC, to various destinations on the Lower Mississippi and on the Intracoastal Waterway."[11]

5.  In February 2020, Turn Services operated a barge fleeting facility located in the Mississippi River that spanned both the East and West Bank at or near Lower Mississippi River mile marker 91 (hereafter, the "Dockside Fleet").[12]

6.  In February 2020, Turn Services owned and operated spar barges that formed the base for each tier of barges in its fleet.  The barges in Turn Service's fleet were secured or lashed together with wires and lines supplied by Turn Services while in the fleet.[13]

---

[8] R. Doc. 47 at ¶¶ 1 & 3.
[9] R. Doc. 47 at ¶¶ 2 & 4.
[10] R. Doc. 47 at ¶ 5 (*citing* Trial Exhibit 1).
[11] R. Doc. 47 at ¶ 6 (*citing* Trial Exhibit 1).
[12] R. Doc. 47 at ¶ 8; R. Doc. 52 at ¶ 1.
[13] R. Doc. 47 at ¶ 9; Trial Testimony of Captain Brandon Melerin.

7. In February 2020, Turn Services owned and operated the M/V KELSO, the main fleet vessel for Turn Services' Dockside Fleet on the East and West banks of the Mississippi River.[14]

8. In February 2020, Turn Services chartered the M/V CAPT. GORDON V to assist the M/V KELSO in fleet operations.  The Dockside Fleet Order for February 22, 2020 confirms that the only fleet boats for the Dockside Fleet were the lead boat, the M/V KELSO, and the assisting boat, the M/V CAPT. GORDON V.[15]

9. In February 2020, Turn Services was responsible for employing a fleet mate as the designated person in charge of the Dockside East and West bank fleeting areas.[16]

10. The fleet mate hired by Turn Services, Jordan Chauvin, worked Monday through Friday.[17]

11. Chauvin was not on duty on Saturday, February 22, 2020.[18]

12. On February 22, 2020, Turn Services assigned the M/V KELSO as the lead boat for the fleet, and the M/V KELSO was assigned the duties of the fleet mate.[19]

13. It was the responsibility of the M/V KELSO crew or fleet mate to ensure that the wire or the riggings was correctly placed and in good shape.[20]

---

[14] R. Doc. 47 at ¶ 10.
[15] R. Doc. 47 at ¶ 11; Trial Exhibit 12.
[16] R. Doc. 47 at ¶ 12 (citation omitted).
[17] R. Doc. 47 at ¶ 13; Trial Testimony of Anthony James Collins and Jordan Chauvin.
[18] R. Doc. 47 at ¶ 13; Trial Testimony of Collins.
[19] Trial Testimony of Captain Michael Marshall and Captain Robert Mueller.
[20] Trial Testimony of Captain Marshall.

14. In February 2020, the M/V CAPT. ZIGGY was the towing vessel for Turn Services' Dockside Fleet.[21]

15. The captain of the lead vessel, the M/V KELSO, testified that the responsibilities of the M/V CAPT. ZIGGY when it is in the Dockside Fleet awaiting lock turn it to follow "whatever order I would give to him in the fleet."[22]

16. In February 2020, pursuant to the Time Charter Agreement and Turn Services' instruction, the M/V CAPT. ZIGGY worked to shift barges and to await transport through the locks to their intended destination.[23]

17. On February 22, 2020, the M/V CAPT. ZIGGY was "made up" to three barges in its tow: the RM-3315, IN-65499, and WMG779R.[24]

18. On February 22, 2020, the M/V CORKY and her tow of seven loaded dry cargo barges, the VLB-9169, MEM-2254, ACL-23424, ACL-07107, AEP-507, AEP-7036, and PTC-8910, were secured in the Dockside West Bank Fleet with the assistance of the M/V KELSO.[25]

19. On February 22, 2020, the Mississippi River experienced high water conditions. The Carrollton gauge showed the river stage at 15.61 feet.[26]

---

[21] R. Doc. 47 at ¶ 15.
[22] Trial Testimony of Captain Melerin.
[23] R. Doc. 47 at ¶ 17 (*citing* Trial Exhibit 2d).
[24] R. Doc. 52 at ¶ 21; Trial Testimony of Captain Marshall.
[25] R. Doc. 47 at ¶ 18 (*citing* Trial Exhibit 11); R. Doc. 52 at ¶ 23.
[26] R. Doc. 47 at ¶ 20 (*citing* Trial Exhibits 29 & 38). *See also*, R. Doc. 52 at ¶ 19.

20. A Marine Safety Information Bulletin issued by the United States Coast Guard, "Carrollton Gauge at 15 Feet and Rising," was in effect on February 22, 2020 – the date of the allision.[27]

21. The Marine Safety Information Bulletin issued by the Coast Guard imposed additional high water requirements found in 33 C.F.R. § 165.803(m) for the Lower Mississippi River.[28]

22. Pursuant to these additional high water requirements, the person in charge of a fleeting facility must ensure that each fleet consisting of eight or more barges is attended by at least one radar-equipped towboat for each 100 barges or less, and that each fleet has two or more towboats when: (1) barges are withdrawn from or moved within the fleet and the fleet at the start of the operation contains eight or more barges; or (2) barges are added to the fleet and the number of barges being added plus the fleet at the start of the operation total eight or more.  The person in charge of each of these towboats is also required to maintain, "When moored, a continuous watch on the barges in the fleeting facility."[29]

23. Due to the high water stage of the Mississippi River and for its additional responsibilities, Turn Services charged the owners of the barges in its fleet a 33% High Water Surcharge on February 22, 2020.[30]

---

[27] R. Doc. 47 at ¶ 23 (*citing* Trial Exhibit 27).
[28] R. Doc. 47 at ¶ 24.
[29] 33 C.F.R. § 165.803(m)(2)(i)-(ii) & (iv)(B).  *See*, R. Doc. 47 at ¶ 25.
[30] R. Doc. 47 at ¶ 26 (*citing* Trial Exhibits 2d, 2e, 5a, & 34).

24. On February 22, 2020, Turn Services instructed the M/V CAPT. ZIGGY to build tow with three loaded barges for transit through the locks.[31]

25. On February 22, 2020, the M/V CAPT. ZIGGY and her three-barge tow were connected by wires and lines in Turn Services' West Bank Fleet, awaiting clearance to travel through the Industrial Canal Locks.  The M/V CAPT. ZIGGY's turn was number 36, indicating an approximate 36-hour delay.[32]

26. In the afternoon of February 22, 2020, Turn Services' spar wires in its West Bank Fleet parted without warning or notice to either the M/V CAPT. ZIGGY or the M/V CORKY.  Those spar barge wires were the responsibility of Turn Services.[33]

27. At the time of the breakaway, the M/V CAPT. ZIGGY and the M/V CORKY were in Turn Services' Dockside West Bank Fleet, both awaiting their respective lock turns.[34]

28. There was no evidence introduced at trial that either the M/V CAPT. ZIGGY or the M/V CORKY in any way caused the breakaway.

29. As a result of the breakaway, all sixteen barges in Turn Services' West Bank Fleet broke free from the spar barges.  The sixteen barges and the M/V CAPT. ZIGGY and M/V CORKY were connected together and began floating downriver as a block of vessels.[35]

---

[31] R. Doc. 47 at ¶ 27 (citation omitted).
[32] R. Doc. 47 at ¶ 28; Trial Testimony of Captain Marshall; Deposition Testimony of Captain Jason Segura.
[33] R. Doc. 47 at ¶ 32; Trial Testimony of Captain Brandon Melerin, Captain Robert Mueller, and Captain Marshall.
[34] R. Doc. 47 at ¶ 29; Trial Testimony of Artie Brito and Trial Exhibit 45.
[35] R. Doc. 47 at ¶ 33 (*citing* Trial Exhibit 45; R. Doc. 52 at ¶ 30).

30. The cause of the spar wires breakage has not been determined by either party.[36]

31. After noticing the breakaway, Artie Brito, the Turn Services dispatcher whose job was to coordinate boats and fleets, called the captain of the M/V CAPT. ZIGGY who sounded distraught.[37]

32. The Turn Services dispatcher noticed that it appeared that the M/V CAPT. ZIGGY and M/V CORKY were racing towards the M/V ASTORIA HARMONY following the breakaway.[38]

33. At the time of the breakaway, the M/V ASTORIA HARMONY was anchored downriver from the Dockside West Bank Fleet.[39]

34. After being alerted of the breakaway, Captain Jason Segura, who was in the M/V CAPT. ZIGGY wheelhouse, immediately instructed the tug's deckhand to start the engines.[40]

35. The engines of the M/V CAPT. ZIGGY were not on at the time of the breakaway.[41]   The engines of the M/V CAPT. ZIGGY started within sixty seconds of the breakaway notification.[42]

36. While Turn Services' dispatcher testified that he advised someone aboard the M/V CAPT. ZIGGY to keep its engine on prior to the breakaway, the witness

---

[36] R. Doc. 47 at ¶ 34; R. Doc. 52 at ¶ 27.
[37] R. Doc. 52 at ¶ 31; Trial Testimony of Artie Brito.
[38] Trial Testimony of Artie Brito.
[39] R. Doc. 47 at ¶ 40 (*citing* Trial Exhibit 45).
[40] R. Doc. 47 at ¶ 36 (*citing* Trial Exhibit 45).
[41] R. Doc. 47 at ¶ R. Doc. 52 at ¶ 28.
[42] R. Doc. 47 at ¶ 38 (*citing* Trial Exhibit 45); Trial Exhibits 26(a)-(i) & 45; Trial Testimony of Artie Brito.

was unable to recall who he so instructed. Further, the witness' notes made on that day failed to include notes of any such instruction.

37. The captain of the M/V CAPT. ZIGGY, Captain Jason Segura, testified that he was not advised to keep his engines running on the day of the collision.[43] Captain Segura's testimony in other respects is supported by documentary and other evidence, including MRTIS and AIS—maritime information systems—as well as Turn Services' Operations Policies & Procedures Manual. The Court finds Captain Segura's memory more reliable, more supported by the evidence, and testimony more credible regarding whether the M/V CAPT. ZIGGY was instructed by Turn Services to keep its engines on prior to the breakaway.

38. While Turn Services expert, Captain Mike Marshall originally testified that being "ready able" means having engines available in the ability to get underway on very short notice, he later testified that his opinion was that it also meant to have the engines on.

39. Gulf South's expert, Capt. Marc Fazioli testified that to be "immediately operational" means to have "the capability of turning this [the vessel] on."[44] Capt. Fazioli further opined that such an understanding of immediately operational is consistent with industry standards.[45]

40. Capt. Fazioli also testified that the language in Turn Services' Operations Policies and Procedures Manual was consistent with the standard guidance in

---

[43] Deposition Testimony of Captain Segura.
[44] Trial Testimony of Captain Marc Fazioli.
[45] *Id.*

9

other maritime safety management systems.[46]  The Court finds the testimony of Fazioli more consistent, supported by the evidence, and more credible on this point than that of Turn Services' expert, Captain Michael Marshall, especially in light of the language in Turn Services' Operations, Policies, & Procedures Manual which supports his opinion.

41. Turn Services' Operations Policies & Procedures Manual, introduced at trial without objection, contains a procedure for "Main Engine Shutdown During Delays," and sets forth the following procedure: "While awaiting locks, during the fog delays, or when loading or discharging barges, shut down at least one engine (two, if safety conditions allow) in an effort to conserve fuel and reduce cost."[47]  The Operations Policies & Procedures Manual further provides that engines should be restarted every 12 hours during extended delays and brought to operating temperature to check equipment.[48]

42. Captain Marshall, who was the former Vice-President of Operations for Turn Services, was unable to adequately explain why the language of the Operations Policies & Procedures Manual regarding engine shutdown did not apply to the M/V CAPT. ZIGGY as it awaited its approximate 36-hour delay to enter the locks.  Capt. Marshall merely testified that, "nobody was ever disciplined for not following that procedure."[49]  There was no evidence introduced that

---

[46] *Id.*
[47] Trial Exhibit 32 at p. 2.
[48] *Id.*
[49] Testimony of Captain Marshall.

conflicted with the information provided in Turn Services' Operations Policies & Procedures Manual.

43. There is no regulation which require a vessel's engines to be on while a tug is in fleet waiting lock turn.[50]

44. After its engines were started, the M/V CAPT. ZIGGY began pushing against the sixteen barges that broke away from the fleet to try to prevent the barges from floating downstream.[51]

45. One or more of the sixteen barges impacted the anchor chain and bulbous bow of the M/V ASTORIA HARMONY, causing damage to the M/V ASTORIA HARMONY.[52]

46. The RM-3315, owned by Terral Riverservice, Inc. ("Terral") sustained damages in the amount of $144,968.38.[53]

47. The VLB-9169, owned by American Commercial Barge Line, LLC ("ACBL") sustained damages in the amount of $137,970.54.[54]

48. The MEM 0457, owned by  AEP River Operations, LLC, sustained damages in the amount of $2,642.50.[55]

49. The AEP-507 sustained damages in the amount of $783.75.[56]

---

[50] Testimony of Captain Fazioli.
[51] R. Doc. 47 at ¶ 39 (*citing* Trial Exhibit 45).
[52] R. Doc. 47 at ¶ 41.  *See*, R. Doc. 52 at ¶ 34.
[53] R. Doc. 52 at ¶ 42.
[54] R. Doc. 52 at ¶ 45.
[55] R. Doc. 52 at ¶ 46.
[56] R. Doc. 52 at ¶ 44.

50. The breakaway barges were ultimately contained and re-secured by the efforts of multiple towing vessels.[57]

51. The actions of the captain of the M/V CAPT. ZIGGY prevented further damage than that which occurred.[58]

52. Following the allision, Turn Services engaged a surveyor, Fred Budwine of Budwine and Associates, to inspect the 16 barges.  Turn Services paid Budwine and Associates $20,917.50 for the survey work.[59]

53. On April 13, 2020, counsel for Gulf South wrote to Turn Services seeking preservation of the mooring cables.[60]

54. Despite this request, the mooring cables were not preserved by Turn Services.[61]  There was no evidence introduced at trial that the mooring cables were inspected, documented, or examined by Turn Services following the breakaway.

55. Turn Services has demanded that Gulf South provide defense and indemnity pursuant to the Time Charter Agreement.[62]

56. Turn Services drafted the Time Charter Agreement.[63]

57. The pertinent language in Section 17 of the Time Charter Agreement, entitled "Hold Harmless and Indemnification," states that the Owner, Gulf South, shall

---

[57] R. Doc. 47 at ¶ 42 (*citing* Trial Exhibit 45).
[58] R. Doc. 47 at ¶ 43.
[59] R. Doc. 52 at ¶ 47.
[60] Trial Exhibit 21 at p. 1.
[61] Trial Testimony of Artie Brito.
[62] Trial Exhibit 20.
[63] R. Doc. 47 at ¶ 15.

protect, defend, indemnify, and hold harmless and release the Charterer, Turn

Services:

FROM AND AGAINST ALL CLAIMS, DEMANDS AND CAUSES OF
ACTION OF EVERY KIND AND CHARACTER ARISING OUT OF OR
RESULTING FROM WORK THAT IS THE SUBJECT MATTER OF
THIS CHARTER ON ACCOUNT OF: 1) PERSONAL OR BODILY
INJURY, ILLNESS OR DEATH TO EMPLOYEES OF THE OWNER
AND OWNER'S CONTRACTORS AND SUBCONTRACTORS
(OWNER'S GROUP), 2) PROPERTY INJURY OR DAMAGE TO OR
LOSS OF PROPERTY OWNED, OPERATED, LEASED,
CONTROLLED OR PROVIDED BY THE OWNER'S GROUP, AND 3)
POLLUTION, REGARDLESS IF THE CLAIM, DEMAND OR CAUSE
OF ACTION HAS BEEN CAUSED BY THE SOLE, JOINT AND/OR
COMPARATIVE NEGLIGENCE, STRICT LIABILITY, PRODUCTS
LIABILITY, BREACHES OF EXPRESS OR IMPLIED WARRANTIES,
THE UNSEAWORTHINESS OF ANY VESSEL, OR ANY MEMBER OF
THE CHARTERER'S GROUP.[64]

58. The Court finds that Turn Services has failed to prove by a preponderance of

the evidence that Gulf South owned, operated, leased, controlled, or provided

any of the barges in the Dockside Fleet.

59. When asked, "When a boat, a tugboat, is made up to barges, are those barges

considered under that tow?," Capt. Marshall, the expert for Turn Services,

testified, "That statement plain would be maybe or not necessarily.  It would

depend on the context, where the barges are and what the role of that tug is at

the moment."  Capt. Marshall further testified that when the barges either

being pushed or pulled by a tug are in a fleet, the fleet operator has them in

their custody and "they are being cared for by the fleet operator such as

Turn."[65]

---

[64] Trial Exhibit 1.
[65] Trial Testimony of Captain Marshall.

60. Capt. Fazioli, Gulf South's expert, testified that the captain of the M/V CAPT. ZIGGY was not in control of the fleet when she was awaiting lock turn in the fleet.[66]

61. The Court finds that the control of the barges in Turn Services' Dockside Fleet rested with Turn Services.

62. The Court further finds that Gulf South did not have control over the fleet when the breakaway occurred because the M/V CAPT. ZIGGY and the M/V CORKY were not working as fleet boats.  The evidence shows that the M/V KELSO and the M/V CAPT. GORDON V were the vessels in charge of and in control of Turn Services' East and West Bank Fleets.

63. On January 11, 2021, Turn Services entered into a Receipt, Release, Assignment, and Cooperation Agreement with Terral Riverservice, Inc. ("Terral"), owner of the RM-3315.[67]

64. The Release Agreement required Turn Services to pay Terral $106,300.00 in exchange for the release, compromise, settlement, remise, and discharge of damages or claims Terral had or may have against Turn Services as a result of the February 22, 2020 incident.[68]

65. Terral also agreed to "dismiss, without prejudice, its Lawsuit against Turn [Services]," but Riverservice did not agree to discharge its entire claim.[69]

---

[66] Trial Testimony of Captain Fazioli.
[67] R. Doc. 47 at ¶ 48 (*citing* Trial Exhibit 40).
[68] R. Doc. 47 at ¶ 49; Trial Exhibit 40.
[69] R. Doc. 47 at ¶ 50; Trial Exhibit 40 at ¶ 1(c).

66. Turn Services paid consideration for the claims, rights, demands, causes of action, damages, or injuries that Terral had or may have against Turn Services,[70] but excluded any remaining, non-settling tortfeasors – in this case, Gulf South.

67. On January 12, 2021, Turn Services entered into a Receipt, Release, Assignment, and Cooperation Agreement with American Commercial Barge Line, LLC ("ACBL"), owner of the VLB-9169.[71]

68. The Release Agreement required Turn Services to pay ACBL $13,120.54 in exchange for the release, compromise, settlement, remise, and discharge of damages or claims ACBL had or may have against Turn Services as a result of the February 22, 2020 incident.[72]

69. Turn Services paid consideration for the claims, rights, demands, causes of action, damages, or injuries that ACBL had or may have against Turn Services, but excluded any remaining, non-settling tortfeasors – in this case, Gulf South.[73]

## III.   CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333.

2. The Court has determined that admiralty law applies to the claims asserted in this matter.

---

[70] R. Doc. 47 at ¶ 51; Trial Exhibit 40 at ¶ 1(a).
[71] R. Doc. 47 at ¶ 52 (*citing* Trial Exhibit 41).
[72] R. Doc. 47 at ¶ 53; Trial Exhibit 41.
[73] R. Doc. 47 at ¶ 54; Trial Exhibit 41.

3. "Courts in maritime cases *must* apply general federal maritime choice of law rules."[74]

4. "Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable."[75]

5. Here, the Time Charter Agreement entered into between Turn Services and Gulf South includes a choice-of-law provision selecting "The General Maritime Law of the United States and the laws of the State of Louisiana" to govern the construction, interpretation and performance of the Agreement.[76]

6. In Louisiana, a contract is the law between parties.[77]

7. Generally, ambiguous contractual provisions in a contract are construed against the drafter of the contract.[78]

8. The Time Charter Agreement, however, specifies that, "Ambiguities in the Charter are not to be construed against any party."[79]

9. Thus, any ambiguities in the Time Charter Agreement will not be construed against Turn Services as the drafter of the contract.

10. The Court, however, finds that the provisions in the Time Charter Agreement are not ambiguous.  Pursuant to the indemnity provision, Gulf South did not own, operate, lease, control, or provide any of the breakaway barges that were

---

[74] *Richard v. Anadarko Petroleum Corp.*, 850 F.3d 701, 707 (5th Cir. 2017) (quoting *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 241 (5th Cir. 2009) (internal quotation marks omitted)) (emphasis in original).
[75] *Richard*, 850 F.3d at 707 (quoting *Great Lakes*, 585 F.3d at 242) (internal quotation marks omitted).
[76] Trial Exhibit 1 at ¶ 20.
[77] *Lumar Marine, Inc. v. Ins. Co. of N. America.*, 910 F.2d 1267, 1273 (5th Cir. 1990).
[78] *Id.*
[79] Trial Exhibit 1 at ¶ 23.

in Turn Services' Dockside Fleet on February 22, 2020, which caused the damages in this matter.

11. As such, Gulf South does not owe Turn Services defense and indemnity obligation under the Time Charter Agreement.

12. In February 2020, Coast Guard regulations, specifically 33 C.F.R. § 165.803 applicable to fleets on the Mississippi River, were in effect.

13. Under that provision, the term "Breakaway" means a barge that is adrift and is not under the control of a towing vessel.[80]

14. Pursuant to 33 C.F.R. § 165.803(g), the person in charge of a barge, tier, fleet, or fleeting facility must ensure that the barge, tier, fleet or fleeting facility meets certain requirements set forth in § 165.803(d) and (e), and must ensure that, "all mooring devices, wires, chains, lines and connecting gear are of sufficient strength and in sufficient number to withstand forces that may be exerted on them by moored barges."[81]

15. Section 165.803(h) provides that, "The person in charge of a fleeting facility shall assign a person to inspect the moorings in accordance with the requirements in paragraph (h)(2) of this section."[82]

16. Section 165.803(h)(2) further provides that the person assigned to inspect moorings shall inspect the moorings at least twice each day during periods that are six hours or more apart.[83]

---

[80] 33 C.F.R. § 165.803(a)(1).
[81] 33 C.F.R. § 165.803(g).
[82] 33 C.F.R. § 165.803(h)(1).
[83] 33 C.F.R. § 165.803(h)(2)(i).

17. The Coast Guard regulations further provide that, "The person in charge of a fleeting facility shall maintain, and make available to the Coast Guard," certain records and documentation, including the times of required inspections, the names of each person inspecting, and the identification of barges that enter and depart the fleeting facility.[84]

18. Turn Services, as the fleet owner and operator of its Dockside Fleet, had a duty to abide by the regulations set forth in 33 C.F.R. § 165.803.

19. Section 165.803(m), which addresses "High water" situations, provides that, "During high water . . . (i) Each fleet consisting of eight or more barges must be attended by at least one radar-equipped towboat for each 100 barges or less. . . . [and] (iii) Each towboat . . .must be: (A) Capable of safely withdrawing, moving or adding each barge in the fleet; (B) immediately operational; (C) Radio-equipped; [and] (D) within 500 yards of the barges. . . . ."[85]

20. On February 22, 2020, Turn Services failed to: 1) assign a person in charge of monitoring the fleet; 2) have at least two towboats within 500 yards of the barges in the fleet; and 3) ensure that all mooring devices, wires, chains, lines, and connecting gear were of sufficient strength and in sufficient number to withstand forces that may be exerted on them by moored barges.

21. Under *The Pennsylvania Rule*, which concerns the burden of proving causation, "any party to a maritime accident who violates a federal statute is

---

[84] 33 C.F.R. § 165.803(h)(2)(3)(i).
[85] 33 C.F.R.§ 165.803(m)(2)(i) & (iii).

presumed to be at fault, and thus, has the burden of proving that the violation could not have been a contributing cause of the allision."[86]

22. In order for *The Pennsylvania Rule* to apply, a party must demonstrate three elements: "(1) proof by a preponderance of evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent."[87]

23. The Court finds that *The Pennsylvania Rule* applies in this case because: (1) Gulf South has demonstrated by a preponderance of the evidence that Turn Services violated a statute or regulation, namely 33 C.F.R. § 165.803, that imposes a mandatory duty; (2) § 165.803 involves marine safety and navigation; and (3) the injury suffered was of a nature that § 165.803 was intended to prevent.

24. Under *The Pennsylvania Rule*, the burden was on Turn Services to prove that its violations did not contribute to the accident.[88]

25. Turn Services has failed to establish that its violations did not contribute to the breakaway accident and subsequent damages.

---

[86] *Impala Terminals Burnside LLC v. Marquette Transportation Company, LLC,* Civ. A. No. 19-12584, 2021 WL 1123566, at *6 (E.D. La. Mar. 24, 2021) (Feldman, J.) (citing *The Pennsylvania,* 86 U.S. 125 (1873)); *Congra, Inc. v. Weber Marine, Inc.,* Civ. A. Nos. 97-1019, 98-3829, 2000 WL 943198, at *5 (E.D. La. July 7, 2000) (Schwartz, J) (quoting *Sheridan Transp. Co. v. United States,* 897 F.2d 795, 797 (5th Cir. 1990)) (internal quotation marks omitted).
[87] *In re Marquette Transp. Co., LLC,* 292 F. Supp. 3d 719, 729 (E.D. La. 2018) (citing *United States v. Nassau Marine Corp.,* 778 F.2d 1111, 1116-17 (5th Cir. 1985)).
[88] *Sheridan Transp. Co.,* 897 F.2d at 797.

26. The Court finds that once notified of the breakaway, Gulf South's tugs became immediately operational and took efforts to prevent the downstream movement of the breakaway barges.

27. Turn Services bears the sole fault for the breakaway and resulting damage that occurred as a result of the breakaway on February 22, 2020.

28. To the extent Turn Services alleges that the allision was caused, at least in part, by the "unseaworthiness of the M/V CAPT. ZIGGY,"[89] Turn Services has failed to put forth any evidence to show that the M/V CAPT. ZIGGY was unseaworthy when it was delivered to Turn Services or on the day of the allision, February 22, 2020.

29. Turning to Turn South's claim for contribution from Gulf South, a settling defendant who obtains a total release from the plaintiff for all parties as part of a settlement agreement may seek contribution from the non-settling defendants.[90]

30. To obtain contribution, a settling tortfeasor must have: (1) paid more than he owes to the plaintiff; and (2) have discharged the plaintiff's entire claim using a full release.[91]

31. A "full release" is one in which the plaintiff releases all potential joint tortfeasors from liability.[92]

---

[89] R. Doc. 52 at p. 6, ¶¶ 43-44 & p. 18, ¶ 13.
[90] *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 603 (5th Cir. 2010).
[91] *Id.*
[92] *Id.* at 603 n.2.

32. Turn Services only paid for the claims, rights, demands, causes of action, damages, or injuries that Terral and ACBL had or may have against it.[93]

33. The Release Agreements entered into between Turn Services and Terral and between Turn Services and ACBL did not satisfy the requirements of a "full release."

34. Because Turn Services did not enter into a "full release" with Terral or with ACBL, Turn Services cannot seek contribution from Gulf South.

## IV.   CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that Turn Services, LLC is solely liable for the allision that occurred on February 22, 2020.  The Court further finds that neither Terral Riverservice, Inc. nor American Commercial Barge Line, LLC executed "full" releases with Turn Services and, as a result, Turn Services, LLC does not have a cause of action for contribution or damages against Gulf South Marine Transportation, Inc.

---

[93] *See*, Trial Exhibits 40 & 41.

**IT IS HEREBY ORDERED** that Gulf South shall have ten **(10) business days** from the date of these Findings of Fact and Conclusions of Law to provide the Court with a proposed Final Judgment, including addressing the stipulation entered into with Intervenors, that is commensurate with the Court's Findings of Fact and Conclusions of Law.  Gulf South shall send the proposed Final Judgment to the Court's email address, efile-Vitter@laed.uscourts.gov.

**IT IS SO ORDERED.**

New Orleans, Louisiana, January 13, 2023.

**WENDY B. VITTER**
**UNITED STATES DISTRICT JUDGE**